THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRY NEWMAN, Defendant-Appellant.

Fourth District No. 4—90—0312

Opinion filed March 21, 1991.—Rehearing denied May 9, 1991.

Daniel D. Yuhas and Lori L. Mosby, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Following a December 6, 1989, bench trial, defendant Terry Newman was convicted of unlawful possession with intent to deliver 15 grams or more but less than 100 grams of a controlled substance (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(a)(2)) and sentenced to eight years' imprisonment. Defendant was acquitted on a separate charge of armed violence. (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2.) Codefendants, Gregory Davis and Marvin Spencer, were also charged with unlawful possession with intent to deliver a controlled substance. On defendant's motion, defendant's case was severed from theirs.

On appeal, defendant contends his conviction must be reversed because (1) the State failed to prove beyond a reasonable doubt defendant possessed a controlled substance with the intent to deliver; (2) the State intentionally withheld from discovery the fact a preraid surveillance had been conducted by the police; and (3) the trial court failed

to consider defendant's motions alleging ineffective assistance of counsel. Defendant also contends the trial court erred in sentencing. We affirm but remand for a correction in his sentence as to credit for time served.

The testimony at trial showed at approximately 11 a.m. on August 2, 1989, a confidential source, who remained unidentified throughout the trial, went to 322½ North 13th Place, located in the John Hay Homes project, and purchased a small quantity of cocaine from Marvin Spencer. The confidential source observed Spencer with a black semi-automatic pistol. Based on this information, Detective Ron Vose obtained a search warrant for 322½ North 13th Place, which was the residence of Spencer's girlfriend, Michelle Thomas. The search warrant provided for the seizure of all firearms and of any controlled substances and related paraphernalia or records.

At approximately 5 p.m., the officers who were to execute the search warrant attended a briefing session where officers were assigned individual tasks. During this time, Vose and Agent Benny O'Neil conducted a surveillance of the apartment and surrounding area.

At approximately 5:50 p.m., the officers arrived at the apartment to conduct the raid. The second-floor apartment had only one entrance, which was located on the south side of the building. Sergeant Steve Fermon arrived first and went to the west side of the building to insure no one fled from the windows located on that side. It was from there Fermon saw a window screen fall from a second-story window and observed defendant trying to exit the apartment from the same window. Fermon thought the window screen might have been kicked out. At this time, Fermon saw nothing in defendant's hands. Fermon identified himself as a police officer and ordered defendant to the floor inside the apartment. Defendant complied. A few seconds later, Sergeant Dan McCarty came around to the southwest side of the building and shouted "He's got a shotgun." McCarty testified he observed a black male standing at the second-floor window with a long-barreled weapon in his hand.

Meanwhile, Sergeant Terry Wubker, who was located on the southeast side of the building, saw someone momentarily stick his head out of an open window when other officers announced the presence of police. Wubker then heard what he thought was the top coming off a toilet and the sound of a toilet flushing. Around the same time, Wubker heard someone yelling from the other side of the building that a weapon had been seen. Wubker testified a lot of activity could be heard from both inside and outside the apartment.

At the same time Wubker testified to hearing the toilet flush, other officers were attempting to open a dead-bolt door on the south side of the apartment. Using a battering ram, it took the officers about one minute to enter the apartment. The officers then had to climb a flight of stairs to reach the apartment. The first officers to enter observed Gregory Davis in the living room of the apartment. These officers ordered Davis to the floor.

The next officers into the apartment proceeded to the only bedroom, which was located directly north of the living room. There they found defendant lying on the floor under the window through which he had attempted to exit. Marvin Spencer was also lying on the bedroom floor near the south wall of the bedroom.

The officers who checked the bathroom, which was located east of the bedroom, noticed the toilet appeared to have been recently flushed and was in the process of refilling.

Davis, Spencer, and defendant were handcuffed and arrested. A search of Davis produced a clear plastic bag containing .8 grams of cocaine and $273. Three tablets, a key, a bullet, a Maryland driver's license, a room key, and $2,000.96 were found on Spencer's person, while defendant had $22 in his left shoe.

After the three men had been arrested, officers conducted a search of the apartment. On the floor near the south wall of the bedroom, officers found a clear plastic bag which held five smaller bags. The contents of two of these bags were analyzed, and each was found to contain cocaine. The gross weight of the larger bag containing the five smaller bags was 5.9 grams. A second clear plastic bag containing eight smaller plastic bags was found under the bed near the west wall. The contents of three of these bags were analyzed, and each was found to contain cocaine. The gross weight of this package was 11.3 grams. Between the bed springs and mattress, officers found a plastic bag containing 25 packets of a prewrapped substance. Five of these packets were analyzed and found to contain cocaine. The gross weight of the packets was 36.1 grams.

Located in a closet between the bedroom and bathroom, officers found a large plastic bag filled with a powdery substance and a 50-gram scale. The plastic bag was found to be filled with 232.7 grams of lidocaine, which is not a controlled substance.

In the kitchen, which was located at the east end of the living room, police officers discovered a .45 caliber pistol and a rifle located in the closet. Both weapons were loaded and the rifle was half cocked. Both the rifle and the pistol were checked for fingerprints. Only one

fingerprint taken was suitable for comparison, and it did not match those of any of the defendants.

A search of the kitchen also produced various amounts of cocaine and drug paraphernalia. Sitting on the kitchen table was a plastic bag containing a powdery substance. The substance weighed 26 grams and was 27.6% cocaine. Residue powder on the kitchen table and from underneath it was also tested as containing cocaine. Officers seized a mirror, razor blade, spoons, baggies, rolling paper, and three strainers. Large quantities of the cutting agent inositol were found on top of the table and underneath it. Residue from the mirror found on the table and from the top of the refrigerator contained cocaine.

An operating police scanner was found in the living room of the apartment. A complete search of the apartment revealed there were no dishes, food, or household supplies in the kitchen. Furthermore, there was no television in the apartment, no sheets on the bed, and no clothes in the closet.

Defendant's pretrial motion to disclose the confidential source resulted in a stipulation the confidential source had never seen defendant at the apartment in the past.

The defendant did not testify and called only one witness, codefendant Gregory Davis. As soon as defense counsel began questioning Davis as to his whereabouts on August 2, 1989, Davis invoked his fifth amendment right to remain silent.

Defendant contends he was not proved guilty beyond a reasonable doubt of the offense of possession of a controlled substance with intent to deliver. In support of his contention, defendant cites he had no cocaine and only $22 on his person at the time of the raid. Defendant contrasts this with the fact Spencer had previously been seen in the apartment dealing drugs and had over $2,000 on his person; Davis had cocaine on him at the time of the raid; and the apartment was rented to Spencer's girlfriend. Defendant contends his conviction was based upon his mere presence in the apartment and, in support, cites the emphasized portion of the trial court's statement below.

In rendering its judgment, the trial court stated the following:

> "This is a case of constructive possession charging the defendant with possession of controlled substance and of armed violence.
>
> The evidence that this court heard is that in this apartment the defendant Newman is found in a bedroom lying on the floor where he was told to lay by the police officer, and right next to the bed and there also under the mattress of the bed was found cocaine packaged up in separate containers.

*I believe there are cases saying that being close to the product is some evidence of possession.*

The court also finds that from the appearance of this place that it wasn't—it doesn't necessarily have to be a place to sell cocaine, that it could be a place where they were making it, packaging it to be distributed and that could account for the fact that there wasn't any further money found." (Emphasis added.)

■ To support a conviction of unlawful possession of a controlled substance with intent to deliver, the State must establish the defendant had knowledge of the presence of the controlled substance, the controlled substance was in the immediate control or possession of the defendant, and the defendant intended to deliver the controlled substance. *People v. Pintos* (1988), 172 Ill. App. 3d 1096, 527 N.E.2d 312.

■ Regarding the first of these elements, we note knowledge is hardly ever susceptible of direct proof. Instead, knowledge may be proved by the defendant's acts, declarations, or conduct from which an inference may be fairly drawn he knew of the existence of the controlled substance at the place where found. *People v. Embry* (1960), 20 Ill. 2d 331, 169 N.E.2d 767.

Defendant has raised no argument on appeal alleging he lacked knowledge of the presence of the controlled substance. Such an argument would be futile based upon the record in this case. Numerous police officers testified to seeing vast quantities of cocaine in the apartment within their plain view. The kitchen area of the apartment was clearly set up to process and package cocaine. The *residue* removed from the kitchen table top and floor constituted 2.8 grams. Bags of cocaine were found in the room in which defendant was found. One of these bags was found lying out in the open on the floor. The contents of the entire apartment were almost solely drugs or drug related. Moreover, defendant's attempted escape from a second-story window lends further support to the contention he had knowledge of the presence of the cocaine.

©3 Concerning the second element of possession, it is well established actual physical possession of the controlled substance is not required. Possession may be constructive as well as actual. The evidence establishing constructive possession is often wholly circumstantial. A trial court must weigh those facts which tend to support a defendant's necessary control over the substance against those facts which demonstrate lack of dominion and control. (*Pintos*, 172 Ill. App. 3d at 1103, 527 N.E.2d at 316.) Furthermore, the fact other persons are present with the defendant will not negate a finding of constructive

possession, since possession may be joint. *Embry*, 20 Ill. 2d at 335, 169 N.E.2d at 769.

The State's proof defendant was in possession of the cocaine is based on circumstantial evidence. The apartment which defendant was found occupying was filled with drugs and drug-related paraphernalia. Defendant was found in a back room of the apartment which contained *over* 53.3 grams of cocaine. The testimony at trial was that a normal cocaine buy takes only minutes. Defendant was in the apartment for at least an hour. Defendant attempted to escape from a second-story window when the raid began. Numerous police officers testified to hearing a lot of activity going on inside the apartment during the time it took them to gain entry. Police officers testified, and later observed, a toilet had been flushed during this time. The officers testified this is a common way of destroying evidence. This evidence is sufficient to establish defendant's possession and control.

Regarding the last element, intent to deliver, it is a reasonable inference possession of a controlled substance in excess of any amount normally intended for personal use is possession with intent to deliver. (*People v. Perine* (1980), 82 Ill. App. 3d 610, 402 N.E.2d 847.) Such an inference is clearly permissible here as the apartment contained vast quantities of cocaine and was clearly set up as a processing place.

Defendant next contends the State intentionally failed to comply with discovery by not disclosing Detective Ron Vose would testify concerning pretrial surveillance. Defendant contends the State's failure to comply with discovery was intentional and points to Vose's testimony as proof.

Pursuant to Supreme Court Rule 412 (134 Ill. 2d R. 412) defendant filed a motion for discovery. The State responded by providing defendant with a list of witnesses to be called and extensive police and lab reports. However, none of the reports, including Vose's own report, made any mention of the preraid surveillance. Defendant contends this failure by the State is not harmless error as the trial court, in rejecting defendant's post-trial motion for acquittal, cited Vose's testimony defendant had been in the apartment for at least an hour prior to the raid.

On direct examination, Vose testified to having conducted a preraid surveillance of the apartment. He testified this was a normal procedure used to determine if any of the occupants were at home, if there is any unusual activity in and out of the location, if any civilians are in the area, and to insure that the roadways surrounding the loca-

tion are clear. In response to the question "Were you alone?" Vose replied "Yes."

Vose testified he began the preraid surveillance at approximately 4:45 p.m. He was stationed so that he could see the front, and only, entrance to the apartment. During the course of the surveillance, Vose saw one individual enter the apartment and stay for approximately five minutes. The man walked up to the apartment and knocked on the front door. An individual from inside the apartment answered.

On cross-examination, Vose testified he made no particular report of the preraid surveillance. In response to the question of why no report was made, Vose answered his job was just simply to let the raid team be aware of the situation before its arrival. Later, Vose did testify it was important to record the times when things occurred during a preraid surveillance. Vose stated the only thing which occurred during this survelliance was that one person entered and exited the apartment. Vose testified he knew this person personally and knew the person was not a resident of the apartment. Vose testified it was possible he did take his eyes off the doorway area and someone could have come in during that time. In response to the question "You were there by yourself doing surveillance?" Vose replied "Yes."

At the conclusion of Vose's testimony, defense counsel made a motion to exclude Vose's testimony concerning the preraid surveillance because it was not mentioned in discovery materials. The trial court denied defendant's motion.

After all the evidence had been heard in this case, the trial court recessed for lunch. Upon reconvening, the State made the following remarks regarding Vose's testimony:

> "I've already spoke with Mr. Lewis on this issue, and Mr. Vose—Agent Vose was the last witness that I called as a witness prior to the lunch break.
>
> During that questioning there was some questioning as to whether or not other people could verify the surveillance conducted by Agent Vose prior to the execution of the search warrant, and Agent Vose indicated that there was not.
>
> During the lunch break Agent Vose and I discovered that Agent Vose had misunderstood—basically had read too much into the question, and the result was that Agent Vose was not by himself. He was the only witness that could testify as to the surveillance, because Benny O'Neil, who was with him, and had been with him throughout these proceedings and could not be called as a witness to testify.

> So when Mr. Lewis asked whether or not someone could verify the surveillance Agent Vose indicated no, because he knew that Agent O'Neil had been in the courtroom and could not testify.
>
> *It was simply a misunderstanding.* Agent Vose *brought it to* my attention as soon as he realized there was a misunderstanding.
>
> I in turn brought it to Mr. Lewis' attention, and in bringing it to the court's attention immediately so that there could be no doubt that we're not trying to conceal anything or no impropriety occurred.
>
> It was just simply a misunderstanding, and we wanted to clear it up with the court."

In response to this statement, the court replied the State previously had an opportunity for redirect examination of Vose and any misunderstanding could have been corrected at that time. The court stated it was not going to give the State leave to reopen its case. Defense counsel made *no* objection to the State's post-trial disclosure nor made any requests to reopen the case or ask for a continuance.

This case is factually similar to a previous case decided by this court. In *People v. Abbott* (1977), 55 Ill. App. 3d 21, 370 N.E.2d 286, the defendant was convicted of burglary of a furniture store and appealed, contending the State had violated Supreme Court Rule 412 in failing to disclose the substance of an officer's testimony. Officer Sestina had been assigned to surveillance of the store and had watched defendant enter and remove numerous items. Officer Sestina called two other officers who arrived and arrested the defendant. The record indicated the State had listed Sestina as a trial witness, though the defense had not made any effort to interview him prior to trial. No memorandum existed concerning the surveillance activity. This court denied the defendant's claims he had not been given a fair trial and cited that the rules of discovery do not require the State reduce all of a witness' pretrial statements to written memoranda. This court further found the State's failure to disclose the occurrence of a surveillance had not been an intentional act to preclude disclosure. *Abbott,* 55 Ill. App. 3d at 24, 370 N.E.2d at 289.

Here, the State's failure to disclose the preraid surveillance was not intentional nor does it constitute reversible error. As in *Abbott,* Vose's name was listed by the State as a witness to be called at trial. From the documents which were disclosed, Vose appeared to have played one of the most active roles in both planning and carrying out the raid. It was Vose who originally procured the search war-

rant in this matter. Though not questioned by defendant on appeal, any inconsistencies in Vose's testimony could have been considered by the trier of fact in determining his credibility and the weight to be given to his testimony.

We disagree with defendant's argument he was totally unaware of the surveillance until Vose testified at the close of the State's case. In opening argument, the State explained while other officers were holding a meeting regarding the execution of the search warrant, Agent Vose and Agent Benny O'Neil were at the area of 322½ North 13th Place setting up surveillance. The first witness called by the State, Sergeant Steven Fermon, stated on direct examination that Agents Vose and O'Neil did not attend the group meeting as they had been sent to the vicinity of the apartment to conduct surveillance.

Last, we find this case to be factually different than *People v. Szabo* (1983), 94 Ill. 2d 327, 447 N.E.2d 193, which defendant has relied upon. There, an assistant State's Attorney made rough notes of the approximately 20 interviews she conducted with an alleged accomplice. The assistant State's Attorney later summarized the interviews into an eight-page outline of the accomplice's expected trial testimony and destroyed the rough notes. When defense counsel moved for disclosure of the rough notes, the State refused, claiming they were nondiscoverable work product. The State did offer to produce the eight-page outline if the court so ordered. The supreme court ruled the defendant was entitled to have the notes reconstructed and produced for an *in camera* inspection to determine whether they were work product or discoverable. In making its ruling, the Illinois Supreme Court again reiterated the discovery rules do not require the State reduce all its witnesses' statements to writing; however, when the failure to preserve a statement in written form amounts to an intentional tactic to prevent disclosure of relevant materials to a defendant, such action will not be condoned. (*Szabo*, 94 Ill. 2d at 344-47, 447 N.E.2d at 201-02.) Nothing here suggests an intentional tactic on the State's part to prevent disclosure.

Defendant also contends the trial court erred in failing to consider his *pro se* motions alleging ineffective assistance of counsel and such failure requires reversal or remandment for a hearing on these motions. The State contends defendant waived the issue of ineffective assistance of counsel by failing to bring it to the court's attention and the errors cited by defendant in his motions were tactical decisions which would be excluded from such claims. We agree with the State on waiver.

On March 6, 1990, defendant filed two *pro se* motions. In the first motion, entitled motion for retrial based on ineffective counsel, defendant contended he had wanted to introduce a pretrial statement which he made to Sergeant Fermon. Defendant's motion stated his attorney had told him introduction of the statement would hurt him and the statement was not introduced at trial. Defendant also contended he had wanted a jury trial and had wanted to testify. Again, defendant's motion stated his attorney had disagreed, stating defendant's background would hurt him. Last, defendant cited his attorney had not argued it was a codefendant who was the actual target of the raid. In his second motion, entitled motion for retrial based on withholding information, defendant again reiterated his desire to have his pretrial statement to Sergeant Fermon introduced at trial. At the conclusion of both of these motions, defendant stated "I would like to present oral arguments."

Counsel for defendant filed a motion for new trial or, alternatively, for an acquittal on March 21, 1990. In this motion, defense counsel reargued the facts of the case, stressing the evidence was insufficient to establish guilt beyond a reasonable doubt, the chemical testing performed in this case had been insufficient, and the testimony of Agent Vose regarding preraid surveillance should be stricken as it affected both defendant's right to cross-examination and defense counsel's preparation of the case.

Although no notice of these motions appears in the record, defense counsel's motion for a new trial or alternatively for acquittal was argued prior to the sentencing hearing held on April 27, 1990. Defendant was present at this hearing and testified immediately after at the sentencing hearing. At no time did defendant make mention of his own pending motion.

Unless a motion is brought to the attention of the court and the court is requested to rule on it, the motion is not effectively made. A motion is an application to the court which must be brought to the court's attention. Merely filing the motion with the clerk of the court does not constitute a sufficient application. (*People v. Hornaday* (1948), 400 Ill. 361, 81 N.E.2d 168.) This rule is no different if the motion is filed *pro se*. (See *People v. Beardsley* (1985), 139 Ill. App. 3d 819, 487 N.E.2d 731.) Defendant's additional request for oral argument at the conclusion of each motion does not constitute the required notice. Accordingly, neither reversal nor remandment for a hearing on defendant's motions is required.

Last, defendant contends the sentencing order must be amended to reflect 269 days' credit toward his sentence of imprisonment. With this contention, the State agrees.

The record shows defendant was arrested for this offense on August 2, 1989, and remained incarcerated in the Sangamon County jail until August 18, 1989. At this time, he was transferred to Graham Correctional Center for an alleged parole violation and, on December 20, 1989, defendant's mandatory supervised release was revoked. It was not until January 18, 1990, that defendant was released from the Hillsboro Correctional Center and transported back to the Sangamon County jail. Defendant remained in the county jail until April 27, 1990, when he was sentenced to the Department of Corrections. At no time did defendant post bond for the offenses with which he was charged.

At the sentencing hearing, the trial court relied upon the presentence investigation report, which stated defendant was entitled to 198 days' credit toward a term of imprisonment. This number only reflected days defendant spent in the Sangamon County jail. It did not credit defendant for days spent incarcerated due to his parole violation. At sentencing, defendant stated he thought he was entitled to more than 198 days, and the trial court responded that if it was more, it could be changed later. The record is clear the trial court did not order incarceration for this offense to be served consecutively to time defendant spent incarcerated for parole revocation.

Under these circumstances, defendant is entitled to credit for the entire time he spent in jail between the day of his arrest and the day of his sentencing, notwithstanding that during this time he served approximately one month in the Department of Corrections for a parole violation. (*People ex rel. Gibson v. Cannon* (1976), 65 Ill. 2d 366, 357 N.E.2d 1180; *People v. Bradney* (1988), 170 Ill. App. 3d 839, 525 N.E.2d 112.) Accordingly, we agree defendant is entitled to 269 days' credit toward his sentence of imprisonment and direct the sentencing order be changed accordingly.

Affirmed in part; reversed in part and remanded with directions.

SPITZ and GREEN, JJ., concur.